Where's your client now? My client is currently incarcerated at Pleasant Valley State Prison, Your Honor. Pleasant Valley. Where's that? I don't know. I know there's a prison in Pleasant. Pleasanton. I remember the psychiatrist there. Her name was Dr. Bliss at Pleasanton. Sounds good. Never forget that. Okay. I don't know where Pleasant Valley is. It's probably out in the desert. He has a heat restriction, so he's probably in some cool place. Yeah, he was transferred to the correctional training facility, which is in Soldat, which is definitely warmer than Calipatria, which is near the Mexican border. I didn't look up the location of Pleasant Valley. I hope that the mood permeating the prison matches the name. Okay. Go ahead. Thank you, Your Honor, and may it please the Court. Jeff Nardinelli for Mr. Olivier. I'll try to reserve two minutes for rebuttal, and I'll also try to speak sufficiently loudly for the benefit of Judge Noonan. Thank you. This is a pro se prisoner case in which the district court failed to properly apply the required liberal pleading standard. We appeal the dismissal of ten separate claims. Today I'd like to discuss three issues, the exercise claims, the medical needs claims, and the lighting claims. If we can start with the exercise claim against Warden Scribner. This is the claim that's based on the lockdown that resulted in a 73-day deprivation of exercise. The district court assumed that the objective prong had been met, and the state concedes the objective prong in its briefing. So what we're left with is the subjective prong known as deliberate indifference. And the deliberate indifference inquiry itself has two parts. The first is subjective awareness on the part of the official, and the second is the absence of a reasonable justification. And I think that our briefing makes very clear our contention that the subjective awareness prong has been well pled. On the pleading itself, this is in the record at ER 204, Mr. Olivier alleges that Warden Scribner personally ordered the 73-day lockdown. And so I think the inference that the warden would be subjectively aware of a lockdown that he himself ordered is clear. I think there's a hotter point of contention regarding whether or not the lockdown was reasonably justified. The stated justification on the face of the pleadings is that this was a contraband purge to make way for a new incoming warden, Warden Small. Two additional points I'd like to make about the sufficiency of this contraband purge. First of all, in this court's decision in Thomas v. Ponder, this court stated that a reasonable justification for a long-term exercise deprivation required a state of genuine emergency. There's nothing in the pleadings that indicates that there was anything approaching a genuine emergency here. And the second case that I feel is a particularly useful counterexample is the Noble case, Your Honor, decided by this court in 2011. Noble was another exercise deprivation claim. It was another lockdown situation. There had been what was described as a savage attack at the prison, the worst incident that had taken place in 20 years, a life-changing event. Twenty-one staff members were injured, nine were hospitalized. In the wake of this assault, of this attack, there had been a lockdown. And what the court really focused on in Noble was the official's response to this attack and their conduct during the lockdown. A lot of the facts in that decision are presented by way of an affidavit from the unforgettably named Captain Comfort, describing that the primary purpose of a lockdown is to rigorously and continuously assess the conditions at the prison so that you can restore rights, such as outdoor exercise, as soon as possible. We've got the exact opposite circumstance in this case. In this case, and this is on the face of the pleadings at ER 204, the lockdown went into effect on March 20, 2008. And it was to stay in effect until June 1 of 2008. There is absolutely no nexus of this mandated 73-day lockdown to the conditions of the prison, to the safety of the prisoners. And that alone, I think, defeats not only any reasonableness justification, but any supposed ‑‑ A contraband suite, is that a reasonable justification? It is possible that there would have been so much contraband, Your Honor, as to rise to the level of genuine emergency. For instance, in the Noble case, after this attack, there had been handmade weapons all throughout the prison yard. But dismissal would only be proper at this stage if there was no permissible inference but that there was so much contraband as to justify this emergency. And the mere sort of everyday garden variety concern of contraband is absolutely not sufficient.  And also he pleads that there was a new warden coming in. So it may have been for the benefit of the new warden coming in as well. That's what it seems like. But that would seem to be a particularly insufficient reason for, you know, to lock down a prison, because there's no connection between an administrative change and the conditions at the prison, the safety of the inmates. So let me ask you about Scribner's men's ray. Are you relying on the obviousness that it's obvious that being unable to do outdoor exercise for 73 days causes a substantial risk of serious harm? I don't know if we have to rely precisely on the obviousness, Your Honor. There's a sort of a fine line between saying it must have been obvious and so circumstantially we prove the men's ray or simply directly. But there's abundant evidence either way. One of the ways to get there is to look at the prison regulation. So in Allen, this Court found that where a prison had a policy mandating five hours of exercise per week and that policy was not met, you've made out, in that case, you can proceed to trial on deliberate indifference. Here the prison has a five-hour policy. It might even be the same State regulation. State regulations also prohibit a 10-day deprivation of exercise absent extreme circumstances. So for those reasons, at least, Your Honor, we allege that Warden Scribner had the adequate men's ray. If we could move to the lighting claims, there are two additional points that I'd like to make there. The lighting claims, for one thing, are unique in that these are the only claims for which the district court did not assume the objective prong had been met. So I want to talk about the objective prong. For one, it's hard to reconcile the dismissal of the objective prong here in light of this Court's decision in Grenning, which was handed down this year. In Grenning, a prisoner was incarcerated in a special unit. He committed some offense for 13 days. And in this cell, there was continuous lighting. The prisoner complained of the inability to sleep and of migraine headaches. Here, again, on the face of the complaint, Mr. Olivier complains of migraine headaches and insomnia. The only difference is that whereas in Grenning there was a 13-day incarceration, here it was the entire term of the incarceration, which ended up amounting to three years and two months. Can you tell us what you mean by or what the petitioner means by constant illumination? Constant illumination means just that, Your Honor. There is a light on in the cell that literally never goes off 24 hours a day, seven days a week, for the entirety of the incarceration. And is there a legitimate purpose for that? There's none stated in the record, Your Honor. We don't really – the pleadings don't really present any disputed issue concerning whether or not there was some justification. It's simply not there. Was this the only cell that had constant lighting? We don't know, Your Honor. I know that Mr. Olivier was transferred from one cell to another and both had the constant lighting. It's not clear from the record. I believe that facility-wide at Calapatria, there's constant lighting. If I could make one more point about the adequacy of the pleading on the objective prong, what the district court held was that Mr. Olivier had – what he needed to further do was to indicate something about the type or the brightness of the lights. And we addressed this in our brief that he shouldn't be expected to describe the lumens or the wattage and that what matters is, you know, the effect that it had on him. I want to stress that even if Mr. Olivier had pled wattage or lumens or candle feet, the constitutional relevance of those measures would only be incidental. The only directly relevant constitutional measure of the luminosity is the effect that it has on the prisoner, because that goes back to simply the baseline deliberate indifference inquiry, which is that you have to know of a difficulty being experienced by the prisoner and take action or inaction regardless. And if I can reserve the rest of my time. Thank you. Good morning. May it please the Court, Jose Zaldan Zepeda, Attorney General's Office for Defendants. Plaintiff Maurice Olivier is a state prisoner with a long history of frivolous litigation. Here he complained about a litany of prison conditions, including not having a single cell, constant lighting, lack of exercise, and denial of a sleeping mask and a kosher diet. The district court gave him multiple opportunities to amend and gave him specific instructions about what he needed to do in order to meet the requirements to state a claim. And initially he was unable to do so. The second time he declined the district court's invitation. But he has all those attachments that sort of document what was, you know, I mean, you have, I think you're not disputing that we should consider the attachments as part of his petition, right, or his complaint? No, Your Honor. We do not dispute that. So he has all those attachments that kind of elucidate all of that. And he is a pro se prisoner. Even with the complaints that are attached to the, pardon, the grievances and other documents that are attached to the complaint, we submit that even if this court were to look at those, his claims still fail. Because what they actually do is they shed light, sorry, no pun intended, but on his actual claims as to the subjective element part, which is basically what the district court found the plaintiff failed to plead for, basically for essentially, actually for most of his claims, for two of his three claims. And if I could go specifically to the, out to the lighting issue. The case law, as plaintiff's counsel stated, does not require a precise wattage or lumens or some sort of scientific calculation of the light. But because given the case law at the time when the district court rendered this decision, which was before this court's decision in Chappelle in 2003 and Grenning in 2014, the case law at the time said that cell lighting claims are very context specific, and therefore, it was necessary for the plaintiff to plead additional facts. And the district court informed the plaintiff of this and said go back and see if you can plead additional facts. Now, we're not saying, and the district court was not saying, you have to go ahead and give some sort of scientific evidence. But like Judge Preggerson was saying, it's important to know what type of lighting this was, because it could be anything from sometimes prisons, I can tell you from my experience, even though it's not in the record, but it can be from some sort of light that's sort of like a night light that you might have near an appliance to the cell lights that are overhead. And there are different types of lighting, and they serve different types of purposes, and therefore, it is important for a plaintiff to have alleged what a little bit more facts about the type of lighting that was at issue. Kennedy, the prison knows. Pardon? It's not as if the prison doesn't know what kind of lighting there is. Correct, Your Honor. But the defendants have not had a chance to make a factual record because this went out on a 12b-6, and what we're talking about is that the plaintiff made enough allegations to state a viable claim for the case to go forward. And under the case law, it is a context-specific claim, and it is up to the plaintiff to make these particular allegations. And the district court was in the position of trying to figure out whether he had made sufficient allegations based on the case law in order for his case to go forward. And the district court determined that he hadn't and gave him specific instructions about what he needed to do, including about – including citing the context-specific type of analysis for these claims. How was he going to get that information? He didn't need to have – it's not as if he needs to go outside somewhere else and say, okay, I need to get more information about this. It would have been as simple as the cell in my light – To go to the prison authorities and ask them? No, Your Honor. It's as simple as me saying in my hotel room, it's this light that was on 24 hours a day throughout the night, and it was really bright so that I couldn't even close my eyes, and even through putting my sheets over my eyes, I couldn't read. We're not talking about scientific evidence. We're not talking about some sort of specialized evidence. It's something that was particularly within the plaintiff's own knowledge, because only he knows what type of lighting he experienced. And that's all that we're saying, and that's all that the district court was saying that he needed to do. He claimed that it was sufficiently bright that it caused him medical problems. It – I forget the exact words that he used, but the district court determined that this was not sufficient because there wasn't enough – because of the Eighth Amendment standard, because it prescribes excessive punishment that's basically beyond the bounds of the evolving standards of decency, the district court determined that he needed to show more specifics about what was it about the lighting. And if this court looks at its own decision, Chappelle v. Mandeville, that goes through case law about lighting, it talks about why it's important to make those allegations about the particular type of lighting. Now, the district court did not have the benefit of that decision, obviously, because it post-stated the district court's decision. In any event, on the – even on the – if this court were to find that on the objective prong, the plaintiff's allegations met that standard, on the subjective prong, the plaintiff's allegations and the attachments to the original complaint show that he did not put prison officials on notice that there was this damage that was being – this injury that was being caused to him by this supposedly damaging lighting conditions and, therefore, his claim. Well, are all the cells lighted 24 hours? Or just his? There are – there are different types of cell lighting, Your Honor. Like, as I was saying earlier, so without knowing more specifics about where he was complaining about, whether it was – I know that there's some – that cells have lighting that stays on throughout the night for safety and security reasons, and then there's the overhead light that the inmates can turn on and off or staff turn on and off at night so the inmates can sleep. So it's unclear what the plaintiff was referring to. Because he was – because he says that it was constant illumination, I think the fair inference is that it was the night lighting that was left on. He doesn't – the plaintiff's complaint doesn't say that it was only his cell that had these particular conditions, which makes it more likely that it's the lighting that's consistent throughout all prison cells. So you don't know whether all the cells are lighted in that facility? I know that as a general practice, prison cells have different types of lighting, some of which stays on 24 hours for security reasons, but that's the lighting that's lower in the cells so that it will not impact the inmates' ability to go to sleep. And then there's the brighter fluorescent light that stays on until the night when it's turned off. Even if this Court were to find that the plaintiff made a showing on the objective and the subjective prongs, which we don't think the plaintiff has for the reasons set out by the district court, then we'd urge this Court to affirm the district court dismissal on the alternative ground of qualified immunity. At the time the defendants acted, there was no case law saying that the type of lighting that the plaintiff alleges was unconstitutional. That would go to qualified immunity, right? Yes, that's correct, Your Honor. And that's a defense, right? Correct, Your Honor. You haven't answered this petition yet, or the complaint yet. That is correct. We can't assert in defense yet, so I don't know why we would be discussing qualified immunity. Well, no, there's case law that says that qualified immunity should be raised in address at the earliest possible stage. We did raise it at the district court below, and the district court did not reach it because it found that the plaintiff had not made a claim out under the 12B6 standard. But we'd urge the Court that either on the subjective prong or under qualified immunity, the defendants would prevail. I wanted to go ahead and address the plaintiff's exercise claim. As Plaintiff's Counsel pointed out, there's a couple of different elements. There's the subjective prong. There are other cases on the illumination of cells on the books. This isn't the first one. That is correct, Your Honor. But the type of lighting, but what the previous cases have said is that it's not context-specific. And this Court, as late as the Chappelle v. Mandeville case in 2013, granted qualified immunity to prison officials given the fact that it was unclear at the time that they acted what type of lighting violates a prison's claim, especially if there's a legitimate penological purpose for the particular lighting that is alleged. And going back to this Court's decision, and I think, Alan v. Sakai, but I might have the case wrong. The fact of the matter is that it is context-specific, and in that case, it involved 24-hour lighting, those large fluorescent lights that were being shown in this particular individual's cell. That's not the type of conditions that the plaintiff alleges, even though he had the opportunity to make those allegations. If I could just make a brief point at the time that I have on the exercise claim. Well, you have some people are very, have a problem sleeping with the lights on. I don't have that problem. I can sleep any place. But a lot of people have that problem. And so there's no process there where they, in the prison, where they can accommodate the person that has that problem? I see I'm over my time, but if I could have a little bit of time to answer your question, Judge Ferguson. Yeah. So basically, that highlights why the plaintiff's claim fails on the subjective problem, because there is no specific, he doesn't point to anything where he told prison officials, I have this horrible lighting condition and I need a separate type of lighting. What he complained about is I want to be transferred to a single cell or I want to be transferred to Federal custody. But in any event, to answer your question, if a particular individual has that type of a condition. Headaches and all kinds of problems. If a plaintiff has that type of medical condition that requires some sort of accommodation, there is a process for him to do that. And he has to go through the grievance process. But there is a way that that can be alleviated if the particular lighting is something that can be turned off without jeopardizing security concerns. And since I'm. Yes. Yes. The prison does have that process, Your Honor. It's a grievance process. In this particular case, the attachments to the plaintiff's initial complaint show that what he complained to prison officials about is I want to go to a Federal prison because I'm not, I'm unhappy with a bunch of different conditions.  conditions. And mentioned cell lighting, but he didn't specify that it was causing him some sort of extreme injury and that, therefore, that was the reason why he needed that, so that they could address that particular concern rather than his. Has Olivier given any treatment for his sleep problems? The record shows, and I actually have a citation if Your Honor would like it, that the prison, that the medical staff referred him to mental health to address his insomnia concerns. What the plaintiff wanted was to have medication and the response of the prison officials, according to the attachments to the complaint, were the response. I don't know how referring you to mental health. You're bothered by the lights and can't sleep and you're having headaches. And I don't understand that treatment. In the context, Your Honor, of reading the grievance, it's the plaintiff wanted particular medications, particular sleeping medications. He wanted a sleeping mask. He wanted, I mean, just, you know, a night mask or, I mean, that wasn't unreasonable to ask for. What his actual complaint say is, if I'm going from memory and I have the citation, is that he wanted the medications. And prison officials said, the medical staff said, you were referred to mental health in the context, I read that as saying so that they could assess what's actually necessary. But they said, based on prison policy, we cannot give you sleeping medications. And I don't know the background for that policy and there's nothing in the record to further explain it. But he wasn't just told, we're not going to do anything to address your sleeping problems. All right. Unless there's any further questions, we'll submit the case. And we ask the Supreme Court to affirm the Supreme Court's decision. Thank you. So I'd like to make clear, Mr. Olivier raised three separate grievances complaining about the lighting and the injuries that the lighting was causing. There was a grievance to his counselors, that's in the record at 380 to 388. There's a medical grievance in the record at 405 to 412. And there's a second medical grievance in the record at 370 to 378. The only treatment that he got was a pamphlet entitled, How to Sleep Better While in Prison. He was absolutely not given any medication. He was absolutely not given a sleeping mask. And at ER 406, it is stated that mask and sleeping medication are prohibited by prison policy. And the Caldwell case, Your Honor, decided by this court in 2014, says that when a prisoner is deprived of medical treatment, not due to a considered medical judgment, but instead due to an institutional policy. That is the very definition. That is the paradigm of deliberate indifference. One other thing I'd like to note, we haven't gotten into the claim against Warden McEwen for the exercise deprivation. Yeah, I'm just wondering, is there any evidence in the record that McEwen reviewed the appeal filed by Olivier when he was complaining about his transfer delay? There is no evidence in the record that McEwen personally appealed the grievance. McEwen's name? Reviewed it. I'm just wondering if he's a proper defendant. We believe that he is, Your Honor. I think you've read the briefing on the syllogism that we've alleged that he knew because he retaliated because he didn't act on it, et cetera. There are two cases that I think bolster the plausibility of the inference that he knew. The first case is Farmer, which is a Supreme Court case, an opinion by a justice suitor. What happened in Farmer was that a particularly susceptible prisoner had been placed in general population and assaulted. The prisoner claimed that it was deliberately indifferent of the warden to allow her to be placed in the general population. In that case, for summary judgment purposes, it was considered to be a triable issue of fact that the warden did know. At the sort of micro level that a prisoner was in general population as opposed to somewhere else in the prison, the inference that we're seeking here is at a more macro level. We're simply asking this Court to infer that the warden would have known about a medical transfer order, and that's in the record at ER-431. I see I'm out of time, Your Honor. I've got one other case that I think is instructive, if you would permit. What is the name of it? It's Lemire, L-E-M-I-R-E. We have that. We have that case. I think you briefed it. Yes, Your Honor. There's an aspect of it that we didn't brief. All right. What is it? We'll take the bait. Okay. Sure. So it's another case that gets at what we can plausibly infer a warden to know about. So in Lemire, the complaint of conduct was a meeting of all of the prison guards that removed those prison guards from the floor of the prison and left the prisoners unsupervised. At the summary judgment stage, the warden submitted an affidavit saying, I did not know about this meeting, and I did not approve of this meeting. But the claim was allowed to proceed past summary judgment on the basis that this was the type of meeting that the warden would be expected to know about. And so we ask for a sort of similar inference here, that a medical transfer order, saying that one of your wards is moving from this prison to another, is also the type of thing that a warden would be aware of. Thank you. Thank you. This matter is submitted.
judges: Pregerson, Noonan, Wardlaw